**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Joseph Church, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>Hotels.com L.P.; Expedia, Inc., Travelscape, LLC, Reservations Technologies, Inc., d/b/a Reservations.com; Benjamin & Brothers, LLC d/b/a Reservations.com,<br><br>        Defendants. | Case No. 2:18-cv-18-RMG<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND MOTION TO STAY PURSUANT TO SECTION 3 OF THE FEDERAL ARBITRATION ACT [ECF-14]** |

Plaintiff Joseph Church ("Plaintiff") respectfully submits this Memorandum of Law in Opposition to Reservations Technologies, Inc., d/b/a Reservations.com and Benjamin & Brothers, LLC d/b/a Reservations.com's (collectively "Defendant"[1]) Motion to Dismiss for Lack of Personal Jurisdiction and Motion to Stay Pursuant to Section 3 of the Federal Arbitration Act. [ECF-14].

## BACKGROUND

Defendant operates a website at www.reservations.com (the "Website") that sells hotel room reservations. *See* [ECF-5, ¶ 1]. The Website provides online hotel booking services at what it estimates to be 150,000 hotels around the world. *See* [ECF-5, ¶ 2]. The Website claims it will help consumers make the "best decisions on [their] upcoming Hotel Reservations" using the "simple yet informative site":

---

[1] Defendants take the position that Reservations Technologies, Inc. is not a proper party and that Benjamin & Brothers, LLC is the owner and operator of the subject website. *See* [ECF-14, p. 1 n.1]. Plaintiff's use of the term "Defendant" herein is intended to collectively include the moving Defendants. However, Plaintiff's counsel is willing to meet and confer with counsel for Reservations Technologies, Inc. if indeed it was in no way involved in the subject hotel reservation and is not a proper party.

> We help you make best decisions on your upcoming Hotel Reservations. We understand that life is an experience, and we aim to help our users to create as many as they can in a simple yet informative site, and with thousands of hotels to choose from, we make landing the accommodation of your dreams as easy as one click.

*See* [ECF-5, ¶ 15]. Defendant's business includes both selling hotel reservations to South Carolina residents and advertising and booking hotels within South Carolina. Specifically, Defendant advertises and offers consumers the ability to book hotel rooms at over 300 hotels within South Carolina. *See* Ex. 1 (screenshots showing the Website offers the ability to book at 29 hotels in Hilton Head, SC; 36 hotels in Greenville, SC; 49 hotels in Columbia, SC; 68 hotels in Charleston, SC; and 140 hotels in Myrtle Beach, SC). Additionally, Defendant receives approximately 1.5% of its annual revenue from South Carolina residents. [ECF-14-1, ¶ 14].

## I.    **The Website**

The Website does not require an account or registration for its services; instead anyone can gain access to search for and book hotel rooms. *See* www.reservations.com. On the homepage, customers provide a destination city, airport, or hotel; a check-in and check-out date; and the number of rooms. *See* Ex. 2. Based on the customer's criteria, the Website provides the relevant options. Beside each listed option is a large red button with the word "Reserve" in white. Ex. 2.

After clicking on the "Reserve" button, the customer is taken to the "secure checkout" page. Ex. 2. At the top of the page is a countdown, which starts at fifteen minutes, that encourages the customer to "**ACT FAST! Rates and availability change quickly.**" Ex. 2 (bold in original). This great deal may only be available for the next [countdown from 15:00] minutes." Ex. 2. While the clock is ticking to either complete the reservation or be subject to rates and availability of the rooms changing, the customer is given the full details of the transaction. Ex. 2. A column on the right side of the screen summarizes the transaction that the consumer may enter into. *See* Ex. 2.

This column includes pop-out boxes that define the "Service Fee" and "Tax & Fees" that will be charged; a box describing the "Room cancellation policy, hotel information and fees;" and a notice stating, "Full payment will be charged to your credit card when you book this hotel.  All Charges in USD."  Ex. 2

To the left of the transaction summary is a form the customer must complete with "GUEST DETAILS," "BILLING ADDRESS," and "PAYMENT DETAILS."  Ex. 2.  After reviewing the information and completing the form, the customer—still on the clock—encounters a large red button emblazoned with "COMPLETE RESERVATION" in capitalized white letters.  Ex. 2. The customer is not required to read the Terms of Service, check a box indicating agreement to the Terms of Service, or otherwise indicate any assent to the Terms of Service.[2]  *See* Ex. 2.

In describing the Website, Defendant states that next to the "Complete Reservation button the Website provides: "By clicking the "Complete Reservation" button you agree to our Terms of Service and hotel room cancellation policy."  Def's Mot.  Patel Aff.  [ECF 14-1, ¶16].  Defendant does not include any screenshots of the webpage Plaintiff viewed at the time he completed his hotel reservation.  A current review of the Website reveals that the language upon which Defendant relies purportedly referencing the Terms of Service is composed in relatively small gray font on a light gray background.  *See* Ex. 2.   Additionally, the sentence relied upon by Defendant follows a statement that "[y]our information is protected and SSL encrypted secure." Ex. 2.   The foregoing language is situated beside a security "lock" logo and the statement, "**SECURE SERVER shop with confidence**", set in bold typeface. Ex. 2.  Nowhere does this checkout webpage reference the terms "arbitration", "dispute resolution", or "waiver" of any kind.  Ex. 2.

---

[2] The sample reservation shown on Exhibit 2 is for the Elliot House Inn in Charleston, South Carolina, where the proper tax is 13.5%.  The taxes on this sample reservation are 22.55%, resulting in a significant overcharge.

II.    **Plaintiff's Transaction on the Website**

Plaintiff, a South Carolina resident, reserved a hotel room for a family vacation using the Website.  *See* [ECF-5, ¶¶ 8, 27]; Ex. 3, Affidavit of Joseph Church ("Church Aff."), ¶ 2.  Plaintiff booked a room with two queen beds at the Hyatt Regency Orlando for two nights with a Check-In Date of Monday, June 5, 2017 and a Check-Out Date of Wednesday, June 7, 2017. *See* [ECF-5, ¶ 27].

In completing his hotel booking, Plaintiff was not required to click on any link providing any terms and conditions or check a box acknowledging that he had reviewed and agreed to any terms and conditions.  Ex. 3, Church Aff., ¶ 7-8.  In fact, all that Plaintiff had to do was enter his name, address, and credit card information and click the large, red, stand-alone button that stated: "**COMPLETE RESERVATION**." Ex. 3, Church Aff., ¶¶ 7–9.  Plaintiff did not see or review the Terms of Service;[3] did not see any reference on the Website to the Terms of Service; and was not required to review or scroll through the Terms of Service at the time of his booking. Ex. 3, Church Aff., ¶¶ 4– 6.

Plaintiff completed his transaction, without agreeing to any Terms of Service, and was charged $14.99 for the Service Fee, $518.30 for "Room, 2 Queen Beds, Accessible, Bathtub," and $108.68 for "Tax & Fees." *See* [ECF-5, ¶ 28].  He was overcharged for "Tax & Fees." The Website explained that "Amounts displayed in the Taxes and Fees line for prepaid hotel transactions include an estimated amount we expect the hotel to bill for applicable taxes, government fees, and other charges that the hotels must pay to the government." *See* [ECF-5, ¶ 21].  However, the total

---

[3] Plaintiff's claims do not rely upon the Terms of Service, which he never viewed or agreed upon, but on other statements and representations found on the Website.  The representations about "Taxes and Fees" are located on the webpage Plaintiff and any consumer would see in completing the transaction.  [ECF-5, ¶ 45].

applicable taxes, government fees, and other charges that must be paid to the government for Plaintiff's reservation only totaled $69.97 (13.5%) and, therefore, Plaintiff was overcharged approximately $38.71.  *See* [ECF-5, ¶ 29].

When Plaintiff booked his hotel, his credit card was charged immediately, including for the overcharged amount.  *See* [ECF-5, ¶¶ 30–31].   On Plaintiff's credit card statement, the $14.99 Service Fee was attributed to "WWW.RESERVATIONS.COM WWW.RESERVATI FL." [ECF-5, ¶ 30].  Plaintiff's credit card statement included a separate charge of $626.98 for the "Room" charge and the "Tax & Fees," which was attributed to "HOTEL*RESERVATIONS.COM 877-903-0071 WA."  [ECF-5, ¶ 31].   Plaintiff, on behalf of himself and all other similarly situated consumers, initiated this action for the recovery of amounts overcharged by Defendant.

## ARGUMENT

## I.    This Court has Personal Jurisdiction over Defendant

Defendant moves to dismiss Plaintiff's suit arguing it lacks sufficient contacts with South Carolina to allow this Court to assert personal jurisdiction.  However, Defendant downplays the extent of its interactions with this State. Despite Defendant's suggestion to the contrary, the grounds for this Court's jurisdiction are more than a simple statement that "the alleged harm was felt by Plaintiff in South Carolina." [ECF-14, p. 6].  Instead, Plaintiff alleges Defendant engages in systematic and deliberate contact with this State and from that conduct this suit arises.  This Court's exercise of personal jurisdiction is therefore appropriate and constitutionally sound.

A federal district court may exercise personal jurisdiction over a nonresident defendant "if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process."  *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993).  The Supreme Court of South Carolina has held South Carolina's long-arm statute

is coextensive with the limits of the Due Process Clause. *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997). "Thus, the first step is collapsed into the second, and the only inquiry before the court is whether the due process requirements are met." *Gourdine v. Karl Storz Endoscopy-Am., Inc.*, 223 F. Supp. 3d 475, 483 (D.S.C. 2016).

Under the due process analysis, a defendant has minimum contacts with a state when "the defendant's conduct and connection with the forum state is such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009) (internal quotation marks omitted). General personal jurisdiction exists when a defendant's contacts with the forum state are "continuous and systematic," thereby permitting the exercise of jurisdiction for actions unrelated to defendant's contacts with the state. *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414–15 n.9 (1984). A defendant is subject to specific personal jurisdiction when the suit arises out of or is related to the defendant's contacts with the forum. *Id.* at 414 n.8. Whether a court has specific jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (first alteration in original) (citation omitted). Thus, in determining "whether specific jurisdiction exists, the Court considers '(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Gourdine*, 223 F. Supp. 3d at 483 (quoting *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003)). Briefly stated, the Court must determine whether a defendant has minimum contacts with

6

the forum, whether the controversy emanates from those contacts, and whether the exercise of jurisdiction is reasonable.

"First, the relationship must arise out of contacts that the 'defendant *himself* ' creates with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985)).   "Second, our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."   *Walden*, 134 S. Ct. at 1222.   "Courts evaluate the reasonableness of personal jurisdiction by considering (a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and the shared interests of the several states in furthering substantive social policies." *Outpost Capital Mgmt., LLC v. Prioleau*, No. CV 2:16-3684-RMG, 2017 WL 5514513, at *2 (D.S.C. Nov. 16, 2017) (internal quotations marks omitted).   "'Minimum contacts' and 'reasonableness' are not independent requirements; rather, they are aspects of the requirement of due process, and thus "considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."   *Id.*

Defendant complains it has insufficient contacts with South Carolina because it "does not actively engage in business in South Carolina," Affidavit of Yatin Patel ("Patel Aff.") [ECF-14-1, ¶ 5], and the Court cannot assert jurisdiction based solely on the claim that Plaintiff suffered an injury here.   However, this characterization of the extent of Defendant's conduct related to the allegations in the complaint is specious.[4]   Certainly, Plaintiff suffered an injury in South Carolina based on Defendant's wrongful acts, but additionally he contends Defendant overcharges

---

[4] Notably, despite the claim of not actively engaging in business, the affidavit admits that "1.5% of [its] gross bookings were from South Carolina residents." Patel Aff. ¶ 14.

consumers for taxes and fees in "nearly every reservation booked on the Website." [ECF-5, ¶ 33]. This allegation encompasses not only those bookings made by residents, but also those rooms booked for South Carolina hotels. Upon information and belief, Defendant similarly overcharges customers staying in South Carolina hotels, misleading them to believe the taxes and fees are non-negotiable expenses they would incur through any method of purchase. To wit, a consumer comparing hotel room rates may find similar prices amongst different websites, and unwittingly pay more on the Website because he assumes, based upon the description of "Tax & Fees" on the Website, any required fees are standard calculations. Not only does this malfeasance occur in South Carolina, but the very nature of Defendant's wrongdoing misrepresents the State and local government as a means to conceal its misconduct. The insidious nature of Defendant's actions lies in the fact that it perpetrates this scheme to overcharge customers under the color of government authority. Defendant has therefore purposefully availed itself of the privilege of doing business within this State through effectively distorting valid charges levied by the government to swindle excess profit from its customers.

Further, Defendant's interaction in this State indicates its contacts are extensive enough that it should be subject to State regulations and, therefore, that it has similarly brought itself within the reach of the long-arm statute. Although Defendant downplays its activity in the forum by averring it does not pay taxes here and has not actively engaged in business here, this assessment appears contrary to established precedent. In, *Travelscape, LLC v. South Carolina Department of Revenue*, 391 S.C. 89, 705 S.E.2d 28 (2011), the Supreme Court of South Carolina considered whether Travelscape, another online travel company offering hotel reservations (and a defendant in this action), was subject to state accommodations taxes on the gross proceeds it derives from a

hotel booking. *Id.* at 103, 705 S.E.2d at 35. Determining Travelscape was statutorily required to pay accommodations tax, the Supreme Court concluded,

> Clearly, Travelscape was engaged in the business of furnishing accommodations in South Carolina during the audit period, seeing as it: (1) entered into contracts with hundreds of hotels in South Carolina in which the hotels agreed to accept a discounted price, or net rate, for reservations made on Expedia; (2) sent employees to South Carolina for the purpose of negotiating such agreements; and (3) booked reservations in exchange for consideration at hotels located in this State.

*Id.* at 103, 705 S.E.2d at 35. Although the contractual nature of Defendant's relationships with the hotels it works with and how those contracts were sought remains unclear to Plaintiff, it is unmistakable Defendant or its agent(s) negotiated some arrangement with the hotels it works with, and from that relationship it retains profit from booking reservations for hotels in South Carolina.

This Court addressed a similar question in *City of Charleston, S.C. v. Hotels.com, LP*, 520 F. Supp. 2d 757 (D.S.C. 2007), where Charleston and Mount Pleasant claimed proceeds retained by Hotels.com, another online hotel reservation website (and a defendant in this action), was subject to their local accommodations tax ordinances. *Id.* at 762–63. Hotels.com moved to dismiss arguing, *inter alia*, it was not "in the business of furnishing accommodations" as provided in the accommodations tax statute. *Id.* at 767. In denying the motion, the Court concluded "[i]f consumers access a website, use it to book a hotel room, pay the website directly, and never pay the hotel, or interact with the hotel at all until they arrive, the court cannot accept Defendants' assertion that they do not furnish accommodations to consumers." *Id.* at 768. Thus, Defendant is mistaken in its assertion that the online nature of its business insulates it from the authority of this forum. Moreover, the extent of Defendant's business in South Carolina is quite significant— examining only the larger markets, the Website offers reservations at 29 hotels in Hilton Head, 36 hotels in Greenville, 49 hotels in Columbia, 68 hotels in Charleston, and 140 hotels in Myrtle

Beach.  *See* Ex. 1.  Not only is Defendant engaged in business here, it reaps substantial profits from

that business (apparently without paying taxes due here).

The fallacy of Defendant's argument is further demonstrated by the clear solicitation within

this forum.  Defendant employs marketing and online search optimization to insinuate itself before

prospective consumers as the website for hotels located in South Carolina.  A casual search on

Google® for "marina inn at grande dunes," a hotel in Myrtle Beach, produces as its top result a

link taking the prospective consumer to what appears to be that hotel as the hotel's name and

address are listed at the top.  *See* Ex. 4.  However, the link is rather to Defendant's Website and

provides Defendant's own phone number as the hotel's contact information. *See* Ex. 4.  Defendant

is purposefully availing itself of the South Carolina market and placing itself as the booking

intermediary for the hotel in Myrtle Beach.  In doing so, Defendant presents itself as the hotel sited

within the forum and subject to the laws of this State.[5]  Thus, Defendant derives more than mere

income from South Carolina residents; it further purposefully interacts in the very lucrative travel

---

[5] Notably, the *Travelscape* Court found Travelscape established a physical presence in this State
based on its relationship with local hotels:

> Travelscape's physical presence in South Carolina extends beyond
> business visits of employees.  Travelscape enters into contracts with
> South Carolina hotels for the right to offer reservations at various
> locations across the state.  The hotels agree to accept a discounted
> rate for reservations made on Expedia.  In turn, when a reservation
> is booked on Expedia, the customer actually stays at a hotel within
> the state.   Like the corporations in *Tyler Pipe* and *Scripto,* the
> services provided by the hotels are significantly associated with
> Travelscape's ability to establish and maintain a market in South
> Carolina for its sales.  Without the hotels actually providing the
> sleeping accommodations to the customer, Travelscape would be
> entirely unable to conduct business within the state.

*Travelscape*, 391 S.C. at 106–07, 705 S.E.2d at 37.

market of South Carolina for consumers in and out of the State. *Quill Corp. v. N. Dakota By & Through Heitkamp*, 504 U.S. 298, 307 (1992) (("[I]f a foreign corporation purposefully avails itself of the benefits of an economic market in the forum State, it may subject itself to the State's *in personam* jurisdiction even if it has no physical presence in the State.") (citing *Burger King Corp.*, 471 U.S. 462 (1985))).

Thus, Defendant's relationship with South Carolina is not as attenuated as it would have this Court assume. Defendant's presence is more than operating a widely accessible website; instead, it actively benefits from the local economic market, a market grounded in travel and tourism. In the process, it exploits the infrastructure that encourages and solicits visitors around the State, yet it pays no taxes for the profits reaped here. On information and belief, Defendant or its agent(s) contract with local hotels to provide booking services, and often consumers pay the entire cost of their stay in a South Carolina accommodation to Defendant or its agent(s), remitting nothing to the hotel. As part of Defendant's service, it or its agent(s) collects the taxes owed in this State directly from consumers—overcharging them in the process under the guise of government authority. Thus, the contacts Defendant has with South Carolina in relation to this lawsuit are far from minimal. Defendant enjoys many benefits from the business it transacts and the profit it earns here. Furthermore, given the breadth of these contacts, the exercise of jurisdiction is imminently reasonable. *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 319 (1945) ("But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly

be said to be undue."). It can be no surprise that Defendant is now being haled into Court to answer in part for abuses in this State. Accordingly, this Court has personal jurisdiction over Defendant for the litigation of this matter.

## II.     Jurisdictional Discovery is an Appropriate Alternative to Dismissal

As set forth above, Plaintiff believes Defendant has sufficient contacts with the State to support the Court's exercise of personal jurisdiction in this case. Critical evidence regarding these contacts, however, currently is uniquely in the possession of Defendant. For this reason, if the Court does not believe the current record supports its exercise of personal jurisdiction, Plaintiff proposes that he be permitted ninety days in which to conduct limited jurisdictional discovery, and that he be permitted to file a supplemental response to Defendant's motion within thirty days after the completion of the discovery. *See Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 644 (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993) ("When a Plaintiff's claim does not appear to be frivolous, a district court should ordinarily allow discovery on jurisdiction in order to aid the Plaintiff in discharging the burden of establishing the court's jurisdiction."). The proposed discovery would include the following:

- Document requests and interrogatories regarding Defendant's and its agents contacts with South Carolina, including contracts with South Carolina hotels, reservation bookings for South Carolina hotels, and reservation bookings for South Carolina residents;

- Document requests and interrogatories regarding the percentage of Defendant's total reservation bookings derived from bookings for South Carolina hotels;

- Document requests and interrogatories regarding the percentage of Defendant's total revenue derived from bookings for South Carolina hotels;

- Document requests and interrogatories regarding the percentage of Defendant's total reservation bookings derived from bookings for South Carolina residents;

- Document requests and interrogatories regarding the percentage of Defendant's total revenue derived from bookings for South Carolina residents;

12

- Document requests and interrogatories regarding the nature of ownership, management, and control of Reservations Technologies, Inc. and Benjamin & Brothers, LLC and their corporate, contractual, and financial relationship with the other defendants in this action;

- Document requests and interrogatories regarding phone calls, e-mail messages, and online chats between Defendant and South Carolina residents; and

- Depositions of Reservations Technologies, Inc. and Benjamin & Brothers, LLC and/or their employees or officers with knowledge and information regarding the foregoing topics.

For the reasons set forth herein, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss for lack of jurisdiction or, in the alternative, allow Plaintiff ninety days in which to conduct appropriate jurisdictional discovery and thirty days thereafter to supplement his opposition to Defendant's motion.

## III.    Defendant's Motion to Stay/Dismiss the Case Under the Federal Arbitration Act Should Be Denied Because There is No Agreement to Arbitrate

For the Federal Arbitration Act ("FAA") to apply, a moving party must demonstrate: "(1) the existence of a dispute between the parties; (2) *a written agreement that includes an arbitration provision which purports to cover the dispute*; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect or refusal of the [party] to arbitrate the dispute." *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991) (emphasis added); *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002).  It is the moving party's burden to establish the existence of a binding contract to arbitrate the dispute. *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, Inc., 867 F.3d 449, 456 (4th Cir. 2017) ("[A] defendant who seeks to compel arbitration under the Federal Arbitration Act bears the burden of establishing the existence of a binding contract to arbitrate the dispute." (citation omitted)).  Defendant cannot demonstrate the basic, yet essential, requirement

of a written arbitration agreement as required by the Fourth Circuit and the Supreme Court.  As explained herein, Defendant has failed to meet its burden of showing an enforceable written agreement that includes an arbitration provision, because Plaintiff never agreed to any contract with an arbitration provision, and Defendant is not party to any arbitration agreement either.

### a.    Plaintiff did not agree to arbitrate his claims

Defendant's motion is most significant not for what it says, but for what it fails to say. Specifically, although Defendant is quick to point out that the Website's Terms of Service are hyperlinked at the bottom of the webpages from which a customer makes a reservation, it ignores the dispositive fact that nothing requires a potential purchaser to click on the Terms of Service or to accept those terms as part of making a reservation, nor could a reasonable consumer be expected to do so independently as he rushes about to beat the clock after being prompted to "**ACT FAST**." Because Plaintiff did not even see the inconspicuous hyperlink to the Terms of Service or any reference to them, let alone assent to the Terms, there is no mutual assent to arbitrate, and this motion must be denied.

"[A] court may order arbitration only when it 'is satisfied that the parties agreed to arbitrate.'" *Lorenzo v. Prime Commun., L.P.*, 806 F.3d 777, 781 (4th Cir. 2015) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)).  The Supreme Court has reinforced the contractual nature of arbitration agreements and refused to force parties to resolve their disputes through means not mutually intended by them when forming a contract. *See Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 682 (2010) ("[T]he FAA imposes certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion.'" (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 471, 479 (1989)); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)

("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)); *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995) ("[A] party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration . . . .").

Whether the parties agreed to arbitrate is a matter of state contract law. *See Johnson v. Circuit City Stores, Inc*., 148 F.3d 373, 377 (4th Cir. 1998).[6]  Under the laws of South Carolina and Florida, the formation of a contract requires a manifestation of "mutual assent."  *See Edens v. Laurel Hill, Inc.*, 247 S.E.2d 434, 436 (S.C. 1978) ("It is well settled in South Carolina that in order for there to be a binding contract between parties, there must be a mutual manifestation of assent to the terms."); *State v. Fam. Bank of Hallandale*, 623 So. 2d 474, 479 (Fla. 1993) ("Mutual assent is an absolute condition precedent to the formation of a contract.").  Likewise, both states recognize that the parties must have a "meeting of minds" about the terms to form a valid contract.  *See Grant v. Magnolia Manor-Greenwood, Inc.*, 678 S.E.2d 435, 438 (S.C. 2009) ("In order to have a valid and enforceable contract, there must be a meeting of the minds between the parties with regard to all essential and material terms of the contract."); *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1156 (Fla. 2014) (finding an arbitration agreement was unenforceable when there was no meeting of minds about arbitration).  "The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the

---

[6] The contract formation law of both South Carolina and Florida is substantively similar in relevant part without any fundamental conflict, and, thus, the choice of law is not dispositive and has no bearing on the outcome of Defendant's motion at this early stage of the litigation. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (indicating California court need not decide whether online terms are valid when both New York law and California law dictate the same outcome).

15

other party may infer from his conduct that he assents." Restatement (Second) of Contracts § 19 (1981).

The fundamental requirement for mutual assent has not been eliminated because an agreement is formed online in the context of e-commerce. *Nguyen*, 763 F.3d at 1175. "Clickwrap" and "browsewrap" agreements are two common forms of Internet sales contracts used by websites in conducting e-commerce transactions. When a consumer affirmatively clicks an "I Agree" box that clearly references contractual terms on a website before proceeding further to consummate a transaction, that type of assent has been termed a "clickwrap" agreement by the courts. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002); *Costar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 669 (D. Md. 2009). By contrast, a "browsewrap" agreement does not require the consumer to read any terms or take any affirmative action such as clicking an "I Agree" box to assent to terms before proceeding with the transaction. *See In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012). Rather, browsewrap agreements purport to bind the user of a website to "terms of service" or "terms of use" that are not found on the webpage the consumer uses to complete the transaction, but are located on another webpage accessible via hyperlink. *Id.*

Most courts have concluded that clickwrap agreements are valid, enforceable contracts. *See Costar Realty Info., Inc.*, 612 F. Supp. 2d at 670; *A.V. v. iParadigms, L.L.C.*, 544 F. Supp. 2d 473, 480 (E.D. Va. 2008), *rev'd in part on other grounds by A.V. ex rel. Vanderhye v. iParadigms, L.L.C.*, 562 F.3d 630 (4th Cir. 2009). These courts have determined that by affirmatively clicking an "I Agree" box before proceeding further with a transaction, a party demonstrates acceptance of these contracts in accordance with the posted terms. *See, e.g.*, *Koresko v. RealNetworks, Inc.*, 291 F. Supp. 2d 1157, 1162 (E.D. Cal. 2003) (concluding that clicking box on the website marked "I

agree" evinced agreement to terms); *Kraft Real Est. Invs., LLC v. HomeAway.com, Inc.*, No. 4:08-CV-3788-WOB, 2012 WL 220271 (D.S.C. Jan. 24, 2012) (same).

The Website is devoid of anything resembling a clickwrap agreement. Instead, Defendant asserts the Terms of Service are enforceable because the Website contains a valid browsewrap agreement. In cases like this, where there is no evidence that Plaintiff had actual knowledge of the Terms of Service, the validity of a browsewrap agreement depends on whether the website provides reasonably conspicuous notice of the terms of the contract and the consumer provides *unambiguous manifestation of assent* to those terms. *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 791 (N.D. Ill. 2011) (citing *Specht*, 306 F.3d at 32). "Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage." *Nguyen*, 763 F.3d at 1177. However, even where the text is explicit, the design might compromise the text's ability to provide notice to the user. *See, e.g.*, *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 981 (E.D. Cal. 2000) (finding the text indicating "use is subject to license agreement" was provided in small gray print on a gray background and as such was insufficient to put the consumer on constructive notice).

The seminal decision concerning the enforceability of browsewrap agreements, authored by now-United States Supreme Court Justice Sonia M. Sotomayor, is *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002). There, the Second Circuit applied foundational principles of contract law to invalidate an online arbitration clause. *Id.* In *Specht*, the plaintiffs downloaded free software from a webpage by way of a hyperlinked "Download" button. *Id.* at 22. Had those plaintiffs scrolled down further, past the "Download" button, they would have encountered an invitation to "review and agree to the terms of the . . . software license agreement before downloading and using the software." *Id.* The Second Circuit held that the

downloaders were not bound to the license agreement's terms because "a reasonably prudent offeree in plaintiffs' position would not have known or learned, prior to acting on the invitation to download, of the reference to [the] license terms hidden below the 'Download' button on the next screen." *Id.* at 35.  Without actual or constructive knowledge of the terms, the court could not conclude there was mutual assent to those terms—a foundational requirement  for the formation of a contract.  *See id.*  As Judge Sotomayor deftly explained, "*[r]easonably conspicuous notice* of the existence of contract terms and *unambiguous manifestation of assent* to those terms by consumers are essential if electronic bargaining is to have integrity and credibility."  *Id.* at 35 (emphasis added).

Following the logic of *Specht*, courts confronting facts tending to show a reasonably prudent consumer would be unaware of the browsewrap terms generally refuse to find an enforceable agreement. *See, e.g.*, *Nguyen*, 763 F.3d at 1177 (refusing to enforce arbitration agreement where notice of browsewrap agreement was predicated on "Terms of Use" link underlined and set in green typeface at the bottom of the website); *In re Zappos.com*, 893 F.Supp.2d 1058, 1064 (D. Nev. 2012) (holding that terms and conditions were not incorporated where hyperlink was situated near the bottom of the webpage); *Van Tassell*, 795 F. Supp. 2d at 792–93 (refusing to enforce browsewrap arbitration clause in website terms of use that were accessible by clicking through inconspicuous links); *Jerez v. JD Closeouts, LLC*, 943 N.Y.S. 2d 392, 398 (N.Y. Dist. Ct. 2012) (finding browsewrap forum selection clause unenforceable when it "could only be found by clicking on an inconspicuous link on the company's 'About Us' page"). Similarly, courts will refuse to enforce browsewrap arbitration provisions where there is a failure to establish "facts tending to show that a user would have had actual or constructive knowledge of the Terms and Conditions."  *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 25 (2d Cir. 2010).

In *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761 (Fla. Dist. Ct. App. 2017), the Florida Fourth District Court of Appeal affirmed the trial court's denial of an e-commerce defendant's motion to compel arbitration, finding its website did not provide adequate notice of hyperlinked terms and conditions to form an enforceable agreement. There, a consumer who purchased dietary supplements online brought a products liability action against the seller. In the seller's appeal from denial of its motion to compel arbitration, the appellate court noted that although clickwrap agreements are generally enforceable, "'[b]rowsewrap' agreements have only been enforced when the purchaser has actual knowledge of the terms and conditions, or *when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice.*" *Id.* at 762 (emphasis added). In reviewing screenshots that accompanied the seller's affidavit, the Florida appellate court found that the terms and conditions of sale, including the arbitration agreement, were not sufficiently conspicuous to put the plaintiff on inquiry notice where they were referenced in a blue hyperlink at the bottom of each page and to the right side of the "checkout" webpage. *Id.* at 766. "Florida law requires the agreement to specifically provide that the collateral document is being incorporated and to sufficiently describe the collateral document to be incorporated."[7] *Id.* at 765. The court affirmed the trial court's denial of the seller's motion to compel arbitration, finding its website did not clearly satisfy that requirement.[8] *Id.*; *see also IT*

---

[7] The laws of South Carolina and Florida are in accord on this point. *See Shaw v. E. Coast Builders of Columbia, Inc.*, 354 S.E.2d 392, 392 (S.C. 1987). Collateral documents, including those providing for arbitration, may become part of a contract if the "reference is clear and inclusive." *Id.* (affirming trial court's denial of defendant's motion to dismiss based on arbitration terms not included in signed contract because whether parties mutually agreed to arbitrate was unclear and thus a triable issue).

[8] While no state or federal court in South Carolina has considered the matter of browsewrap contract formation, a U.S. District Court here has found clickwrap agreements enforceable because the customer must take affirmative action to review the terms and condition and "click" assent to them before proceeding with the transaction. *See Kraft Real Est. Invs., LLC*, 2012 WL 220271.

*Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C.*, 975 F. Supp. 2d 1267, 1283 (S.D. Fla. 2013) (applying Florida law and finding lack of actual or constructive knowledge of browsewrap agreement and absence of assent to the terms).

Here, a review of the Website illustrates the absence of reasonably conspicuous notice of the Terms of Service to allow this Court to conclude a consumers mere completion of a transaction constitutes an unambiguous manifestation of assent to those terms.    In fact, the Website's browsewrap is clearly deficient in the following ways:

- There is no clickwrap or user account required to use the Website;

- The Website does not provide the language relied on by Defendant[9] until the customer has already search for a hotel, found that hotel, and clicked to "Reserve" that specific hotel room;

- The Website does not provide the language relied on by Defendant until the final checkout page where the customer is literally on the clock and told to "Act Fast" or potentially lose the selected reservation.  This page also presents the customer with the $14.99 service fee and the sum of taxes he will be charged, as well as a link to the room cancelation policy.  During the time allowed, the customer is additionally required to populate the guest details form with his name, billing address, and payment details;

- The language relied on by Defendant in inconspicuous in typeface—the "Complete Reservation" button is what the Website design makes conspicuous, not the language Defendant references as evidence of a customer's assent to the Terms of Service;

- The language relied on by Defendant appears in the second sentence, situated after a statement about security and "lock" logo, in inconspicuous type and is unrelated in subject matter to the first sentence;

---

Nothing suggests South Carolina would apply a different standard than actual notice or constructive notice and unambiguous assent to terms when considering the validity of a browsewrap agreement.

[9] Defendant relies on language stating that "By clicking the 'Complete Reservation' button you agree to our Terms of Service and hotel room cancellation policy." [ECF-14-1, ¶16].

- The language relied on by the Defendant does not mention the arbitration, class waiver, jury trial waiver, or forum selection.

*See* Ex. 2. In sum, there is simply no basis from which the Court can find a consumer had notice, or even inquiry notice, of the Terms of Service so as to be bound by them.

### b.    Plaintiff did not assent to the Terms of Service

As explained above, courts consistently decline to enforce arbitration clauses in browsewrap agreements where the party seeking to enforce the agreement cannot proffer concrete evidence that both parties assented to the terms. *See, e.g.*, *Specht*, 306 F.3d at 22 n.4. Because Plaintiff never expressly assented to the Terms of Service, and Defendant is unable to show Plaintiff constructively assented to them, the terms contained therein, including the arbitration clause, are unenforceable.

The contract involved in this action is undisputedly a browsewrap, not a clickwrap, agreement. Here, Plaintiff attests that when he "made the hotel reservation on the www.reservations.com website . . . [he] did not see or review the Terms of Service referenced in [Defendant's motion]." Ex. 3, Church Aff. ¶ 4. Nor did he see a reference to them. Ex. 3, Church Aff. ¶ 5. Plaintiff was not required to review or scroll through the Terms of Service to complete the transaction. Unlike the agreements at issue in *Kraft*, Plaintiff was not required "click on" or check a box acknowledging that he had reviewed the Terms of Service or assented to them. Ex. 3, Church Aff. ¶¶ 7, 8. Rather, all that was required of him was to enter his name, address, and credit card information in the checkout flow and then click a large, red, stand-alone button that stated: "**COMPLETE RESERVATION**." Ex. 3, Church Aff. ¶ 9. Defendant's motion quotes the arbitration and class waiver provisions from the Terms of Service. *See* [ECF-14, p. 9]. No such language was located on any of the webpages Plaintiff reviewed in completing the hotel

reservation, and he did not agree to such terms.  Ex. 3, Church Aff. ¶ 10.  Plaintiff did not agree to the Terms of Service attached to Defendant's motion, nor did he observe any link to the Terms of Service when he made the reservation.  Ex. 3, Church Aff. ¶¶ 11, 12.

The Patel Affidavit and its reference to the Terms of Service is insufficient to establish contract formation because, as a matter of law, it do not provide a clear factual basis for the Court to conclude Plaintiff manifested his assent to the Website's Terms of Service.  Plaintiff's mere use of the Website can only serve as a manifestation of assent where he had, or should have had, reason to know that his use would be so interpreted.  *See* Restatement (Second) of Contracts § 19 (1981) ("The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.").

Defendant fails to satisfy its burden to show Plaintiff was on notice that mere use of the Website would be interpreted as agreement to the Terms of Service.  The Patel Affidavit does not address the problematic nature of contrasting the size, color, typeface, or location of the language, "By clicking … you agree to our Terms of Service and hotel room cancellation policy," to the red **COMPLETE RESERVATION** button.  Defendant did not proffer a screenshot of the page that Plaintiff would have reviewed in making the reservation on the Website.  Mr. Patel attests that the hyperlink was at the bottom of each page of the website, including the checkout page.  Patel Aff. [ECF-14-1, ¶¶ 16, 17].

Because browsewrap agreements threaten to bind parties to contractual terms without affirmative assent, enforcement of such agreements should be allowed only cautiously, and here Defendant has failed to show the hyperlink in question provides notice to a reasonably prudent internet user.  *See Specht*, 306 F.3d at 20 (refusing to enforce browsewrap agreement where

reasonably prudent internet user was not provided reasonable notice of the agreement). "Clarity and conspicuousness of arbitration terms are important in securing informed assent." *Id.* at 30. Thus, courts have strictly required that notice of a hyperlink and the import of terms therein must be conspicuous; simply placing the hyperlink in proximity to the buttons the user must click to complete the purchase is insufficient. *Nguyen*, 763 F.3d at 1178–79 ("[C]onsumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound."). Here, Defendant has not met its burden of presenting undisputed facts from which the Court can infer valid contract formation in this case, and the motion should be denied.

### c.      Benjamin & Brothers, LLC is not a party to the Terms of Service that includes the arbitration agreement it seeks to enforce

Even if this Court were to believe Plaintiff has manifested assent to the Terms of Service, Benjamin & Brothers, LLC is not a named party to the Terms of Service attached as Exhibit B to Defendant's motion.[10] [ECF-14-2]. Indeed, the words "Benjamin" or "Brothers" do not appear anywhere in the Terms of Service or on the Website. As a result, Benjamin & Brothers, LLC is not a party to the arbitration agreement it seeks to enforce and, as such, lacks standing to seek a dismissal or stay based on the arbitration agreement. *See Weckesser v. Knight Enters. S.E., LLC*, 228 F. Supp. 3d 561 (D.S.C. 2017).

While there is a presumption in favor of arbitration in general, this presumption disappears when the parties dispute the existence of a valid arbitration agreement. *See Am. Heritage Life Ins. v. Lang*, 321 F.3d 533, 537–38 (5th Cir. 2003); *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002). When, as here, the parties dispute whether a valid arbitration agreement exists, any ambiguities and all inferences must be resolved against the drafter, which here would be

---

[10]   Nor is Reservation Technologies, Inc. referenced in the Terms of Service. To the extent that Defendant is a moving party, this argument has equal application to it as well.

Defendant. *Kristian v. Comcast Corp.*, 446 F.3d 25, 35 (1st Cir. 2006); s*ee also, e.g.*, *Sitarik v. JFK Med. Ctr. Ltd. P'ships (JFK)*, 7 So. 3d 576, 579 (Fla. Dist. Ct. App. 2009) ("In construing this ambiguous provision against the [drafter], we find that Sitarik was not bound by the arbitration clause."); *S. A. Fin. Services, Inc. v. Middleton*, 562 S.E.2d 482, 486 (S.C. Ct. App. 2002), *aff'd as modified*, 590 S.E.2d 27 (S.C. 2003) ("Ambiguities arising within a contract must be construed against the drafter. The rule applies with particular force to contracts of adhesion.").

It is a basic tenet of the law of arbitrability that only entities that are parties to an arbitration agreement, or are covered by an arbitration agreement, can enforce that agreement. *See, e.g.*, *InterGen N.V. v. Grina*, 344 F.3d 134, 146–147 (1st Cir. 2003) (noting that "courts should  be extremely cautious about forcing arbitration in situations in which the identity of the parties who have agreed to arbitrate is unclear"); *Westmoreland v. Sadoux*, 299 F.3d 462, 466-67 (5th Cir. 2002) (finding that "a nonsignatory cannot compel arbitration merely because he is an agent of one of the signatories" and noting that "the courts must not offer contracts to arbitrate to parties who failed to negotiate them before trouble arrives"); *McCarthy v. Azure*, 22 F.3d 351, 355, 362 (1st Cir. 1994) (holding that third party could not claim benefit of arbitration agreement to which it was not a party and for which no intent was indicated that third party would be covered). Indeed, as the Supreme Court has held, "[i]t goes without saying that a contract cannot bind a nonparty." *Equal Emp't Opportunity Comm'n. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (noting a court cannot require a party to arbitrate a dispute unless the party has entered into a valid contractual agreement to do so).

This Court recently ruled that a nonparty to an arbitration agreement could not seek to enforce the agreement simply because it was related to the entity that appeared on the agreement.

*See Weckesser*, 228 F. Supp. 3d. at 561.  In *Weckesser*, this Court ruled that an entity known as Knight Enterprises S.E., LLC could not enforce an arbitration agreement entered into between one of its employees and its parent company, Jeffry Knight, Inc. d/b/a/ Knight Enterprises, because the defendant's name did not appear anywhere in the agreement signed by the employee. *Id.* at 563.  The present case is much more troubling.  The Terms of Service that Benjamin & Brothers seeks to enforce do not name any legal entity that purports to be bound to  these alleged terms.  It is also not a misnomer or typographical mistake; the Terms of Service simply refer to a web address ("Reservations.com").   Unlike the *Weckesser* case, which involved alleged typographical mistakes and similarly named parent and subsidiary companies, there is simply no legal entity named Reservations.com.   The only legal entity that now seeks enforcement is Benjamin & Brothers, LLC, a company neither mentioned nor disclosed.  *C.f. Huffman v. Sticky Fingers, Inc.*, No. CIV.A.-2:052108-DCN, 2006 WL 895029, at *1 (D.S.C. Mar. 31, 2006) (declining to compel arbitration under the third-party beneficiary doctrine because the arbitration agreement did not specifically identify which company was meant to receive the third-party benefit that was contemplated.).  The drafter of the Terms of Service could have drafted the document to reflect the legal entity with which the consumer is purportedly agreeing to arbitrate any dispute.  Instead the drafter chose not to disclose any legal entity and create an ambiguity as to the parties to the purported agreement.

Benjamin & Brothers has not bound itself to arbitrate any claims it may have against Plaintiff, and Plaintiff, in turn, has not bound himself to arbitrate any claims he may have against

Defendant. Thus, Benjamin & Brothers lacks standing to enforce the arbitration provision in the Terms of Service.[11]

## IV.    Because This Court Has Personal Jurisdiction, Venue is Proper in This Court

Defendant alternatively argues that even if this Court has personal jurisdiction, venue is proper in Orange County, Florida, pursuant to the forum selection clause in the Terms of Service and under 28 U.S.C. § 1391(b). As discussed in section III, *supra*, Plaintiff never agreed to the any of the terms listed in the Terms of Service, including any forum selection clause, and it is therefore inapplicable. Furthermore, venue is proper under 28 U.S.C. § 1391(b).

Initially, Plaintiff cannot be subject to the forum selection clause because he never assented to it. *See Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 368 (E.D.N.Y. 2009) ("Defendant has failed to explain how Plaintiff and its other customers were 'advised' of the Terms and Conditions, or to cite a single case that suggests that merely posting such terms on a different part of a website constitutes reasonable communication of a forum selection clause. Defendant has therefore failed to show that venue is improper in this District because of the forum selection clause.").

Turning to the venue statute, under 28 U.S.C. § 1391(b)(2), venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or

---

[11] For all the same reasons set forth above reflecting that Plaintiff did not assent to the arbitration clause found in the Terms of Service, which were inconspicuously hyperlinked on the Website, Plaintiff likewise is not bound to the forum selection clause also found in the Terms of Service. *Long v. Provide Commerce, Inc.*, 200 Cal. Rptr. 3d 117, 127–28 (Cal. App. Dep't Super. Ct. 2016) (finding that because plaintiff was not bound by online retailer's Terms of Use in inconspicuous browsewrap, he also could not have been bound by the forum selection clause contained therein); *Hoffman v. Supplements Togo Mgmt., LLC*, 18 A.3d 210, 220 (N.J. Super. Ct. App. Div. 2011) (holding forum selection clause in inconspicuous browsewrap was presumptively unenforceable).

a substantial part of property that is the subject of the action is situated[.]"  When determining whether events or omissions are sufficiently substantial to support venue under § 1391(b)(2), "a court should not focus only on those matters that are in dispute or that directly led to the filing of the action."  *Jeffers Handbell Supply, Inc. v. Schulmerich Bells, LLC*, No. 0:16-CV-03918-JMC, 2017 WL 3582235, at *8 (D.S.C. Aug. 18, 2017).  "Rather, it should review the entire sequence of events underlying the claim."  *Id.*  Although Defendant claims subsection (b)(2) is inapplicable because South Carolina is not home to a substantial part of the events or omissions giving rise to this action, this view again shortchanges its relationship to this State.  As discussed *supra*, within this district, Defendant conducts business and manifests its misappropriation of excess taxes that are the subject of this lawsuit.  Plaintiff's injury occurred in this district as it is where he paid the excess taxes.  These facts sufficiently demonstrate a substantial part of the events of import in this action occurred in South Carolina.  Further, to the extent the Court disagrees and finds venue improper under subsection (b)(2), venue would be proper under § 1391(b)(3) because this Court has personal jurisdiction over Defendant.[12]  *See* § 1391(b)(3) ("[I]f there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.").

---

[12] Although the issue of personal jurisdiction over the other defendants has not been raised, Plaintiff contends such jurisdiction exists, and therefore this Court could find venue proper under § 1391(b)(1), which provides for venue in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  Pursuant to § 1391(c), all defendants can be said to "reside" in South Carolina because this Court has personal jurisdiction over them. *See* 28 U.S.C. § 1391(c)(2) ("[A]n entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question . . .. ").

Finally, without analysis, Defendant asserts "the Court should either dismiss the case for improper venue or transfer the case pursuant to 28 U.S.C. § 14064 [sic] . . .." [ECF-14, p. 16]. Turning to both 28 U.S.C §1404 and §1406, Defendant has failed to prove this case should be transferred pursuant to either of these provisions.  Because Plaintiff has already clarified that venue is proper in this District, 28 U.S.C. §1406 is inapplicable. *See* § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.").

Similarly, Defendant has failed to establish a transfer would be proper under 28 U.S.C. § 1404, which provides that a court may, "[f]or the convenience of parties and witnesses, in the interest of justice, . . . transfer any civil action to any other district or division where it might have been brought . . .."  Transfer of a case pursuant to § 1404 is vested in the discretion of the trial court and involves an inquiry into:

> (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws.

*Herring v. LaPolla Indus., Inc.*, No. 2:12-CV-2705-RMG, 2013 WL 12148849, at *3 (D.S.C. Oct. 7, 2013).  "On a motion to transfer, the movant bears the burden of 'clearly' establishing that a transfer is appropriate and that the motion should be granted."  *U.S. Fid. & Guar. Co. v.*

*Republic Drug Co.*, 800 F. Supp. 1076, 1079 (E.D.N.Y. 1992). "In making the determination as to whether a § 1404 motion should be granted, the plaintiff's choice of forum should rarely be disturbed unless the balance is strongly in favor of the movant." *Figgie Int'l, Inc. v. Destileria Serralles, Inc.*, 925 F. Supp. 411, 413–14 (D.S.C. 1996) (internal quotation marks omitted).

In requesting this transfer, Defendant states no more than that it resides in Florida and a "substantial part of the events or omissions occurred there." This simply fails to overcome the priority of Plaintiff's choice of forum, the strong interest of this forum in the resolution of this matter, or the fact that this dispute will be decided under South Carolina law. Additionally, given the existence of other defendants, any premature transfer may disrupt the assertion of personal jurisdiction and therefore fail to serve justice or convenience by forcing Plaintiff to proceed in multiple courts for the same allegations. Thus, this Court should deny Defendant's motion to transfer as it plainly fails to meet its burden.

## <u>CONCLUSION</u>

Based on the foregoing, Plaintiff respectfully requests this Court deny Defendant's motion in full. Defendant has engaged in substantial and purposeful business in South Carolina directly related to this lawsuit and is therefore subject to the jurisdiction of this forum. If, however, the Court does not believe the current record supports its exercise of personal jurisdiction, Plaintiff requests that he be permitted to conduct limited jurisdictional discovery.

As to whether the FAA applies to this lawsuit, Defendant has failed to prove a binding contract was entered into so as to make the Terms of Service, including the arbitration agreement, enforceable. And even if the Court could conclude the agreement was subject to the FAA, neither Benjamin Brothers nor Reservations Technologies, Inc. are parties to that alleged agreement and are therefore not capable of enforcing it.

Lastly, Defendant has put forth no evidence to justify a transfer from this venue.

Dated: March 16, 2018                    Respectfully Submitted,


                                         *s/John P. Linton, Jr.*
                                         Ian W. Freeman (Fed. ID No. 9416)
                                         John P. Linton, Jr. (Fed. ID No. 11089)
                                         **WALKER, GRESSETTE, FREEMAN &**
                                         **LINTON, LLC**
                                         P.O. Drawer 22167
                                         Charleston, SC 29413
                                         Tel: 843-727-2200
                                         E-mail: freeman@wgfllaw.com
                                         E-mail: linton@wgfllaw.com


                                         James L. Ward, Jr. (Fed. ID No. 6956)
                                         Ranee Saunders (Fed. ID No. 12713)
                                         **MCGOWAN, HOOD & FELDER, LLC**
                                         321 Wingo Way, Suite 103
                                         Mt. Pleasant, SC 29464
                                         Tel: 843-388-7202
                                         E-mail: jward@mcgowanhood.com
                                         E-mail: rsaunders@mcgowanhood.com


                                         ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 16, 2018, I filed the foregoing document via CM/ECF, which caused it to be served on all parties or their counsel of record who have entered appearances in this matter.

<u>*s/ John P. Linton, Jr.*</u>
John P. Linton, Jr.